JASMINE CHAVDA,

    Plaintiff,

        v.

SWEDISH COVENANT HOSPITAL,

    Defendant.

No. 11 C 114
Judge James B. Zagel

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jasmine Chavda ("Plaintiff") filed a complaint against Defendant Swedish Covenant Hospital ("Defendant" or "Swedish") alleging that she was paid wages less than male counterparts, harassed, and terminated in retaliation for reporting harassment in violation of Title VII of the Civil Rights Act of 1964. Defendant moves for summary judgment in its favor and to dismiss Plaintiff's Amended Complaint against Defendant with prejudice. For the following reasons, Defendant's motion for summary judgment is granted in its entirety. Defendant's motion to dismiss is moot.

## I.    FACTUAL BACKGROUND

Plaintiff Jasmine Chavda, an Indian Zoroastrian woman, was employed as a respiratory therapist ("RT") by Swedish Covenant Hospital from April 2007 until her termination on January 5, 2010. Chavda, a respiratory therapist with more than 20 years of experience, has a Bachelor of Science in Microbiology/Chemistry and is licensed by the State of Illinois as a Registered Respiratory therapist. Chavda was supervised by Thomas Brennan from April 2007 until March 2009 and Lori Brajczewski from March 23, 2009 until her termination on January 5, 2010. During her employment at Swedish, Chavda typically worked the overnight shift from

11:00 p.m. to 7:00 a.m. with four other respiratory therapists: Jake, Ted, Ruel, and Deviya. For each shift, Swedish designated one respiratory therapist to be the "charge therapist" to divide patient assignments and handle emergency situations during the shift. The charge therapist's tasks included accessing patient files for other therapists' patients to resolve treatment issues.

Swedish provided periodic training to employees, including Plaintiff, on several policies regarding confidentiality, personal health information, and the Health Insurance Portability and Accountability Act ("HIPAA") that were designed to protect patient's personal health information. Plaintiff was evaluated annually based on compliance with these policies, including the policy requiring confidentiality, and was aware that she was not to access the records of patients for whom she was not providing care. Plaintiff was also aware that "any employee who deliberately or carelessly violate[d] this [patient] confidentiality [policy] [would] be subject to disciplinary action," including potentially being terminated. Since 2010, Swedish has terminated at least eight employees for their unauthorized access of patient medical files for patients they were not treating.

*Plaintiff's Relationship with Coworkers*

It is undisputed that Chavda was in frequent conflict with her coworkers. Plaintiff claims that her coworkers made comments about Plaintiff, including that she was "not getting any," that it was inappropriate for Plaintiff, as an Indian woman, to be divorced twice and to have two different names, and that Plaintiff was old. These comments were never reported to management or Human Resources. Chavda was neither included in holiday celebrations or parties at work nor invited to social events outside of the hospital.

Beginning in 2008 and continuing throughout her employment, Plaintiff made several complaints to Marcia Marczewski, Employment Manager, about her coworkers' behavior.

Plaintiff complained that a coworker, Lisa, locked her in a room and blocked her way until a nurse came and let her out of the room. In April 2009, Plaintiff sought "guidance on what to do" about inappropriate sexual comments and gestures being made by her coworkers. Chavda claimed that, though none of the behaviors were aimed at Chavda, she witnessed her male RT colleagues talking about sex in front of her, making oral gestures in her presence, and inviting the women from her shift into the men's changing area to watch the men change their clothes.

Following Plaintiff's complaint, Marczewski spoke with Brajczewski and Brennan. Plaintiff was called to a meeting with Brennan, Michelle Aronson, Director of Human Resources, and Sedlarz, to further discuss her complaint. Marczewski then arranged for Plaintiff to talk with Anthony Guaccio, Swedish's Senior Vice President and Chief Operating Officer, who also investigated Plaintiff's claims. On June 11, 2009, Human Resources re-trained the entire respiratory therapist department regarding appropriate workplace conduct and Swedish's policy against harassment.

Plaintiff subsequently reported to Marczewski that the behavior of her coworkers was "escalating more than before," and representatives from Human Resources had one-on-one meetings with everyone in Plaintiff's department to discuss appropriate conduct. Plaintiff again complained about her coworkers not performing their work correctly to Sedlarz, which she claimed led to Plaintiff's coworkers throwing things at her. Brajczewski informed the entire respiratory therapy department that they were on a "final warning" and that "harassment, threatening statements or actions will not be tolerated and is grounds for immediate termination." Plaintiff continued making various complaints about her schedule and coworkers.

In August 2009, some of Chavda's coworkers signed a petition requesting that she and a male coworker, Ted Hawala, be removed from their department because it was "absolutely

difficult to get along with [Chavda]" and because Hawala was a "constant complainer." On or around September 22, 2009, Plaintiff received a verbal warning for implying that a patient was fat. On November 20, 2009, Brajczewski informed Marczewski that Plaintiff was threatening other respiratory therapists on her shift and that she was concerned for her safety.

*Chavda's Termination*

On December 4, 2009, a respiratory therapist working with Plaintiff reported that Plaintiff was improperly accessing medical charts of patients that she was not treating. Brajczewski and Marcia Marczewski, Employment Manager in Swedish's Human Resources department, with assistance from Pauline Sedlarz, Senior Director of Nursing, began to investigate these allegations by conducting an audit of the patient charts. Swedish discovered that there was a pattern of Plaintiff accessing patient medical charts of patients for whom she was not the treating respiratory therapist, and during shifts when she was not the charge respiratory therapist. Specifically, Swedish determined that on December 27 and December 28, 2009, Plaintiff was not the charge respiratory therapist, but that she had reviewed patient charts on these two nights for patients for whom she was not assigned to provide treatment.

On January 4, 2010, Brajczewski, after consulting with Sedlarz, Marczewski, and other members of Swedish staff, called Plaintiff at home, suspended her, and asked Plaintiff to attend a meeting to discuss the matter the next morning. On January 5, 2010, Chavda met with Brajczewski and Sedlarz and admitted that she accessed patient information for patients she was not treating because she believed that she was allowed to go back and look at patient records for three days after treating a patient to review her own "charting" or work. Brajczewski told Plaintiff that she violated Swedish's HIPAA policies because she had accessed patient records for patients she was not currently treating and gave Plaintiff a Notice of Disciplinary Action. At

the end of the meeting, Brajczewski told Plaintiff that her employment with Swedish was terminated, effective immediately.

*Complaint with EEOC*

On April 14, 2010, Chavda filed a complaint with the United States Equal Opportunity Commission ("EEOC") for discrimination based on religion, national origin, sex, age, and retaliation. The EEOC determined that it was unable to conclude that the information contained established a violation of the statutes and gave leave to file litigation. Plaintiff filed the present case against Swedish and amended her complaint on April 19, 2011, alleging that Swedish failed to stop the harassment Chavda suffered, retaliated against her when she asserted her rights, and discriminated against her by paying her less than her male counterparts, in violation of Title VII of the Civil Rights Act. Chavda claims that Swedish's finding that she allegedly violated Swedish policies was pretext for terminating Chavda because she asserted her rights to be free from harassment and to be paid equally.

## II.  LEGAL STANDARD

A.  Standard of Review for Summary Judgment

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir.2001). The Court's "function is not to weigh the evidence but merely to determine if there is a genuine issue for trial." *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir.2002).

Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d. 265 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir.2003)(citing *Lujan v. Nat'l Wildfire Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir.2000). I consider the record in the light most favorable to the nonmoving party, and draw all reasonable inferences in the non-moving party's favor. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir.2002).

## III. DISCUSSION

A. Discrimination Claim

Under Title VII, employers may not discriminate "against any individual with respect to [his] compensation, terms, condition, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A Title VII claimant may prove discrimination by presenting direct or indirect evidence. When a plaintiff proceeds under the direct proof method, allegedly discriminatory statements are relevant…only if they are both made by a decisionmaker and related to the employment decision at issue." *Stopka v. Alliance of American Insurers*, 141 F.3d 681, 688 (7th Cir.1998). Here, Plaintiff has presented no direct evidence of discrimination by a decisionmaker, and so she must establish discrimination

under the indirect, burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792, 93 S.Ct., 1817, 36 L.Ed.2d 668 (1973).

The *McDonnell Douglas* burden-shifting analysis requires that Plaintiff initially show that: (1) she was a member of a protected class; (2) she was meeting Defendant's legitimate job expectations; (3) she was subjected to a materially adverse employment action; and (4) others outside the protected class were more favorably treated. *Id.*, 411 U.S. at 802; *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir. 1994). Once Plaintiff makes a *prima facie* showing, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory explanation for the employment action. Plaintiff, then, would have the opportunity to prove that Defendant's explanation was pre-text for discrimination. *Gates v. Caterpillar, Inc.*, 513 F.3d 680 (7th Cir. 2008); *Luks v. Baxter Healthcare Corp.,* 467 F.3d 1049, 1055 (7th Cir. 2006).

Here, the parties agree that Plaintiff, an Indian Zoroastrian woman, is a member of a protected class. Plaintiff asserts that she suffered an adverse employment action because she was compensated at a lower hourly rate than her male coworkers. To prove this, Plaintiff offered a list, entitled "Employee Listing with Salary," containing the employee's name, the employee's hire date, and a corresponding hourly pay rate. Plaintiff, however, fails to establish evidence that demonstrates that a similarly situated respiratory therapist, with similar education, experience, and employment history with Swedish, received better compensation than Chavda. To the contrary, the proffered list reveals great variation in compensation, with Chavda earning an hourly wage greater than most of her colleagues—both male and female. In fact, the list indicates that the only employees earning a higher hourly rate than Chavda were those with a longer history of employment at Swedish. Consequently, Plaintiff has not established evidence that she

suffered an adverse employment action by being inadequately compensated compared to her male coworkers.

Parties do, however, agree that Chavda suffered a materially adverse employment action when she was discharged from employment by Defendant. Plaintiff has failed to identify any similarly situated non-Indian Zoroastrian employees that accessed confidential records of patients they were not treating, that were investigated and disciplined by the same supervisor, and that were treated more favorably than Plaintiff. Because Plaintiff has not established sufficient evidence to establish indirect discrimination, our inquiry may end here and the burden does not shift to Defendant to state a legitimate, non-discriminatory explanation for Plaintiff's discharge. In any case, Plaintiff also fails to establish that she was meeting Defendant's legitimate job expectations at the time of her discharge.

In most cases, in determining whether an employee was meeting legitimate employment expectations, the court evaluates "the employee's job performance through the eyes of [the employee's] supervisors at the time of" the employee's suspension and discharge. *Gates*, 513 F.3d at 689. An employer has the right to make its own business decisions, even if they are wrong or bad as long as the employer acted in good faith and with an honest belief. *Green v. National Steel Corp., Midwest Div.*, 197 F.3d 894, 899 (7th Cir.1999). Unless a plaintiff demonstrates that she was meeting her employer's legitimate employment expectations at the time of her discharge, the employer may not be "put to the burden of stating the reasons for the plaintiff's termination." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319 (7th Cir.2002) (citing *Coco v. Elmwood Care, Inc.,* 128 F.3d 1177, 1179 (7th Cir.1997)).

Plaintiff received training by the hospital on several policies related to confidentiality of personal patient health information, including HIPAA, and was evaluated on these policies

annually. With the exception of the charge therapist, who was permitted to access patient files for other therapists' patients to resolve treatment issues, respiratory therapists were only allowed to access the records of patients for whom they were providing care. Plaintiff's manager Brajczewski received a report from Plaintiff's coworker that Plaintiff was improperly accessing medical charts for  patients that she was not treating. Brajczewski, Marczewski, and Sedlarz conducted an audit of the patient charts which revealed a pattern of Plaintiff accessing patient medical charts for patients from whom she was not the treating respiratory therapist and during shifts when she was not the charge respiratory therapist. Swedish determined that on at least two specific dates, December 27 and December 28, 2009, Plaintiff was not the charge respiratory therapist but reviewed patient charts for patients for whom she was not assigned to provide treatment, in violation of HIPAA. Brajczewski and Sedlarz subsequently met with Plaintiff who admitted accessing patient information for patients she was not treating because she believed that she was permitted to do so. Plaintiff was informed that she had violated Swedish's HIPAA policies, was given a Notice of Disciplinary Action, and terminated from employment.

Defendant terminated Plaintiff for a violation of Defendant's policy that Defendant had expressly stated noncompliance with which "[would] be subject to disciplinary action."  To that end, since 2010, Swedish has terminated at least eight other employees for failing to meet the same legitimate employment expectation—strict adherence with policies intended to protect patients from unauthorized access of patient medical files by non-treating employees.

B. Harassment Claim

Plaintiff claims that she was subjected to a hostile work environment at Swedish because she was harassed on the basis of her religion, national origin, race, age, and sex, and that Defendant failed to stop the harassment from which she suffered. To survive summary judgment

on a harassment claim, Plaintiff must prove four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) her religion, national origin, race, age or sex must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must have been a basis for employer liability. *Yancick v. Hanna Steel Corp.,* 653 F.3d 532, 544 (7th Cir. 2011). To prevail on a claim of hostile environment due to sexual harassment, a plaintiff must also establish that she was subjected to unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature. *Valentine v. City of Chicago*, 452 F.3d 670 (7th Cir. 2006), *as amended* (July 6, 2006)(citing *Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1032 (7th Cir.1998)).

As a respiratory therapist, Plaintiff worked overnight shifts, which placed Plaintiff and her coworkers in close proximity with each other at odd hours, and she was frequently required to work with her coworkers to administer care to patients and, when assigned, as the charge therapist. While Plaintiff does not explicitly claim sexual harassment, the comments and conduct Plaintiff has alleged are largely sexual in nature. Plaintiff concedes that she was not the target of unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, but maintains that she was forced to work in an inappropriately sexual environment in which she witnessed her male coworkers talking about sex in front of her, making invitations to other women that were sexual in nature, and making sexual gestures in her presence.

Plaintiff also complained about a coworker locking her in a room and blocking her way until a nurse came and let her out. Throughout her employment, Plaintiff made various complaints to her supervisor about her coworkers' persistent behavior towards her, as well as their work performance, and sought guidance on what to do. In response to Plaintiff's

complaints, Plaintiff's coworkers began throwing things at her. Plaintiff and her coworkers' relationship had so deteriorated by August 2009 that some of Plaintiff's coworkers signed a petition requesting that Plaintiff be removed from their department because she was "absolutely difficult to get along with."

There is no doubt that Plaintiff and her coworkers were in continuous conflict. But for conflict to rise to the level of hostility, courts require more than "mere offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating." *Yanick,* 653 F.3d at 544. There is sufficient evidence to raise a question of material fact as to whether Plaintiff's work environment was hostile. Nonetheless, Plaintiff's claim fails because she has not presented sufficient evidence to conclude that Plaintiff's background, including her age, sex, or religion, was the cause of the growing animosity between Plaintiff and her coworkers. Plaintiff's reliance on an unidentified coworker's statement, never reported and from as far back as before 2008, that Plaintiff was "not getting any," was old, or that it was inappropriate for Plaintiff as an Indian woman to be divorced cannot support a claim that she was harassed due to her background.

Additionally, Swedish may not be found liable for a hostile work environment created by an employee who was not Plaintiff's supervisor because Plaintiff has not proven that Swedish was "negligent either in discovering or remedying the harassment." *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 505-06 (7th Cir. 2004) (citing *Parkins v. Civil Constrs. of Ill., Inc.,* 163 F.3d 1027, 1032 (7th Cir.1998)). Rather, Swedish responded to Plaintiff's complaints in a timely manner, investigated her complaints, and initiated appropriate trainings and interventions. While Swedish's actions may not have improved the relationship between Plaintiff and her coworkers, Swedish was not negligent in its attempts to remedy the work environment.

C.      Retaliatory Discharge Claim

Plaintiff argues that Defendant terminated her employment in retaliation for making numerous complaints to Swedish's management about being harassed by her colleagues, including that her colleagues engaged in inappropriate behavior that was sexual in nature. An employee can prove that an employer violated the anti-retaliation provisions of Title VII by either direct evidence or by an indirect, burden-shifting approach. To survive summary judgment on a retaliation claim under the direct method, Chavda must provide sufficient direct or circumstantial evidence to establish (1) that she engaged in protected conduct, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between the two. *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668 (7th Cir. 2011). Again, there is no dispute that Chavda's termination constitutes an adverse employment action. Rather, our inquiry is limited to whether Chavda engaged in protected conduct and whether that conduct was causally connected to her termination.

Plaintiff began making frequent complaints in 2008, which continued until her termination in January 2010. Defendant responded to Plaintiff's steady stream of complaints by first conducting a training session on workplace conduct and then, when Plaintiff's complaints continued, by having one-on-one meetings with Plaintiff's colleagues. Defendant took various steps to address Plaintiff's complaints and remedy the poor work environment. It was only after Defendant received a complaint reporting that Plaintiff was improperly reviewing confidential patient information that it undertook an investigation into Plaintiff's conduct. Defendant's investigation revealed that Plaintiff was reviewing charts of patients for whom she was not the assigned respiratory therapist on shifts when she was also not the "charge" therapist. Upon its finding that Plaintiff had violated the hospital's confidentiality policy, Defendant terminated

Plaintiff. Plaintiff fails to present any evidence that Defendant's management's decision to terminate Plaintiff was causally connected to her complaints.

Alternatively, an employee may establish a *prima facie* case under an indirect, burden-shifting method by showing that she (1) engaged in a statutorily protected activity; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Simpson v. Office of Chief Judge of Circuit Court of Will County*, 559 F.3d 706, 717 (7th Cir.2009). As previously discussed, Chavda was not meeting Swedish's legitimate employment expectations at the time of her discharge and, therefore, her claim fails even under the indirect method. As Chavda has failed to establish that she was terminated in retaliation for complaining about her colleagues' inappropriate behavior under either a direct or indirect method, summary judgment is granted in favor of Defendant.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted in its entirety as to all of Plaintiff's claims.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: April 30, 2015